| | 5/92-3/5/97 - Consp. dist. & PWID heroin & crack | 5/92 - 10/24/96 - CCE | 2/7/93 - Murder in drug crime | 2/7/93 - Murder in CCE | 2/7/93 - Use of gun in drug crime | 9/15/94 - Dist. crack | 9/15/94 - Dist. crack prox. | 10/6/94 - Dist. crack | 2/8/96 - PWID crack | 2/8/96 - PWID crack prox. | 11/92 - Use of juvenile to dist. | 2/25/97 - Felon in poss. firearm |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 3/6 | 2 | 4 | 5 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| Holland | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | ✔ | |
| Hill | ✔ | ✔ | | | | ✔ | ✔ | | | | ✔ | ✔ |
| Montgomery | ✔ | | | | | | | | ✔ | ✔ | | |
| Carroll | ✔ | | | | | | | | | | | |
| Coates | ✔ | | | | | | | | | | | |
| Jones | ✔ | | | | | | | | | | | |
| Deberry | ✔ | | | | | | | | | | | |

**UNITED STATES of America, ex rel.
MADE IN THE USA FOUNDATION,
et al., Plaintiffs,**

v.

**BILLINGTON, et al., Defendants.**

Civil Action No. AW–96–3962.

United States District Court,
D. Maryland.

Nov. 21, 1997.

Lynne A. Battaglia, U.S. Atty., Allen F. Loucks, Asst. U.S. Atty., for Government.

Joel D. Joseph, John C. Dempsey, Washington, DC, for Plaintiffs/Relators American Federation of State, County and Municipal Employees, AFL–CIO; Local Unions 26, 2477 and 2910, American Federation of State, County and Municipal Employees, AFL–CIO.

Thomas A. Guidoboni, Washington, DC, for Defendant Automated Sciences Group, Inc.

Walter E. Diercks, Darrin N. Sacks, Frederick D. Cooke, Washington, DC, for Defendant Systems Integration Group, Inc.

### *MEMORANDUM OPINION*

WILLIAMS, District Judge.

Plaintiffs-relators Made In the USA Foundation, et. al. (hereinafter "the Foundation") instituted this qui tam action against the Librarian of Congress and two corporations for violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the Buy American Act, 41 U.S.C. § 10 *et seq.*, in the procure-

ment of work for the American Memory Project, a pilot project directed at digitizing important works maintained by the Library of Congress. Plaintiffs here seek an injunction ordering the Librarian to procure the work in compliance with the Buy American Act, and damages against both Automated Systems Group, Inc. ("ASG") and Systems Integration Group, Inc. ("SIG"). The government has declined to intervene on behalf of the plaintiff, and instead moved for dismissal of the claim against the Librarian of Congress and summary judgment as to the claims against the private contractors. After review of the parties' respective memoranda and careful consideration of their oral arguments, this Court shall grant the government's motion for summary judgment, for the reasons set forth below.

### I. *Background*

As a part of the American Memory Project, the Library of Congress entered into a written contract with ASG to produce a CD–ROM containing two collections from the Library's more important works, and with SIG to produce a digital product of various texts for the National Digital Library. Both corporations certified to the Library of Congress as a part of the proposal that they would comply with the Buy American Act.[1] The Foundation, a non-profit organization dedicated to promoting American products, bases its claim that the Buy American Act (BAA) was violated on a report from the General Accounting Office (GAO) which estimates that 12.6 percent of the total contract cost to ASG went to work performed in Jamaica and 19.8 percent of the total contract cost to SIG went to work performed in the Philippines. Construing this as an intentional and willful violation of the contract, in that these numbers fail to meet the *substantially all* requirement as set forth in the Act, plaintiffs assert that defendants have thus violated the Federal False Claims Act (FCA)[2] as well. Hence, they bring this qui

---

**1.** The Act states, in pertinent part, that "Notwithstanding any other provision of law ... only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured

in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured ... shall be acquired for public use." 41 U.S.C. § 10a.

**2.** "A person not a member of the armed force of the United States is liable to the United States

tam action on behalf of the government seeking damages against ASG and SIG, and an injunction ordering the Librarian of Congress to complete the work in compliance with the BAA.

The government has declined to intervene, pursuant to 31 U.S.C. § 3730(b)(2), on behalf of the plaintiffs. It contends that the Foundation has misread the requirements for compliance with the BAA, in that the applicable standard is found in the Federal Acquisition Regulations (FAR), which interprets the language of the statute to require only that the cost of the domestic components exceeds 50 percent of the total cost of all the components of the end product.[3] In the event that the Court finds that the plaintiffs have stated a claim under the BAA, the government has nonetheless moved for dismissal of the claim against the Librarian of Congress on the grounds of sovereign immunity, and for summary judgment on the FCA claim for failure to provide the government with an adequate disclosure statement.[4]

## II. *Discussion*

### A. Summary Judgment

Summary judgment is designed to secure the "just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 329, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The trial judge has "an affirmative obligation to ... prevent unsupported claims and defenses from proceeding to trial." *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987). The court will grant summary judgment when no genuine dispute of a material fact exists and the moving party is entitled to judgment as a

matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding the motion, the court has viewed the facts and all the reasonable inferences drawn therefrom in a light most favorable to the plaintiffs. *See Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538(1986).

The Court recognizes that the granting of summary judgment before adequate time is allowed for discovery is uncommon. *See, e.g., Guthrie v. Sawyer,* 970 F.2d 733 (10th Cir.1992); *accord, Patty Precision v. Brown & Sharpe Mfg. Co.,* 742 F.2d 1260 (10th Cir.1984). While this may be especially true in cases involving the Buy American Act, *see United States v. Rule Ind., Inc.,* 878 F.2d 535, 538 (1st Cir.1989) (error not to allow jury to apply "fluid legal standards of [BAA]," even though the facts were undisputed), the Court has determined that plaintiffs have failed to provide even the minimal amount of evidence of a statutory violation necessary to proceed. The granting of summary judgment at this stage is thus warranted because plaintiffs cannot adequately "articulate how the desired time [for discovery] would enable [them] to meet [their] burden in opposition to summary judgment." *Guthrie,* 970 F.2d at 738.

### B. The Buy American Act

Enacted in 1933, the central purpose of the BAA was to protect the American worker. *See Allis–Chalmers Corp., Hydro–Turbine Division v. Friedkin,* 635 F.2d 248, 257 (3rd Cir.1980). Since its enactment, it has variously been described as both "sparse and

government ... if the person knowingly presents, or causes to be presented, to an officer or employee of the government ... a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(1), "... or knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved." 31 U.S.C. § 3729(2).

**3.** Intended to implement the Buy American Act, FAR 25.1 applies to supplies contracts exceeding the micro-purchase threshold and contracts for services that involve the furnishing of supplies, when the supply portion exceeds the micro-purchase threshold. The policy states that the BAA requires only "domestic end products" be ac-

quired for public use, *see* FAR 25.102, and defines a domestic end product as "an unmanufactured end product mined or produced in the United States or an end product manufactured in the United States if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components." FAR 25.101.

**4.** 31 U.S.C. § 3730(b)(2) states: "a copy of the complaint and a written disclosure of substantially all material evidence and information the person possesses shall be served on the government under rule 4 of the Federal Rules of Civil Procedure."

confusing," *id.* at n. 17, and nebulous, ". . . we must visit the shadowy precincts of the Buy American Act," *Rule Industries*, 878 F.2d at 538, a development most likely due to the fact that Congress intended that it be flexible in its operation. *See Textron, Inc., Bell Helicopter Textron Division v. Adams*, 493 F.Supp. 824, 830 at n. 8 (D.D.C.1980). However, that flexibility has focused almost exclusively on questions such as what constitutes a domestic end product, how foreign component parts or foreign assembly impact the Act, and what remedy unsuccessful bidders may have available to them. See 41 U.S.C.A. § 10(a-d); *see, generally*, L. Knapp, *The Buy American Act: A Review and Assessment*, 61 Colum.L.Rev. 430 (1969).

 Neither party has pointed to an instance in which the quantitative requirement of the Act was questioned. Presently, there appears no hidden or uncertain guiding principle, for the Federal Acquisition Regulations speak directly to the issue.[5] Defendants have satisfied the requirements of the Act so long as "[the] articles acquired for public use under the contract" had more than 50 percent of the cost originate in this country. *See* FAR 25.101. The estimates stated by the General Accounting Office fall well within the range of spending set forth by the Act.[6] In no way do the regulations consider the amount of labor abroad a factor in determining whether a violation has occurred, and so there is no question that the defendants have complied with the FAR requirements.

Conceding that point, plaintiffs have also advanced the novel theory that the total cost of the domestic end product would, in fact, substantially all come from non-domestic work, in violation of the BAA, if the court were to consider the differential in cost-of-labor between the United States and Jamaica and the Phillippines. While this may be true, the Court has found nothing in the statutory language or the case law to support such an unprecedented undertaking, and is extremely reluctant to presume that Congress intended for it to do so.

 Even assuming that the Court could find that the defendants have violated the Act, there is ample authority against it granting relief. As a general rule, courts should be extremely reluctant to intervene in the procurement procedures of federal agencies.[7] *See Allis–Chalmers Corp., Hydro–Turbine Division v. Friedkin*, 635 F.2d 248, 252 (3rd Cir.1980) ("judicial intrusion into government purchases necessarily delays completion of the contract and increases costs, with little measurable benefit to the public"); *Sea–Land Service, Inc. v. Brown*, 600 F.2d 429, 435 (3rd Cir.1979) ("A showing of clear illegality is an appropriate standard to impose on an aggrieved bidder who seeks relief."); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971) ("If the court finds a reasonable basis for the agency's action, the court should stay its hand, even though it might . . . have reached a different conclusion as to the proper administration and application of the procurement regulations."). The Buy American Act, a statute

---

5. Plaintiff-relators assert these regulations are *"ultra vires* . . . the GAO has no express authority under the Buy American Act." To the contrary, the GAO has broad authority to implement procurement and acquisition regulations such as FAR 25.1. *See* 40 U.S.C. § 486. Even so, reliance on the Federal Trade Commission Act as support for the application of the FTC definition of "Made in the USA" to the BAA, as plaintiff would have the Court do, leaves plaintiff in no better position. The terms "substantially all" and "virtually all" are interchangeable; indeed, at oral argument counsel himself could not articulate a precise definition, other than to say that it must be more than 50%.

6. According to the GAO report, Automated Systems Group, Inc. spent $24,200 out of total $191,821 (12.6%) and Systems Integration

Group, Inc., spent $131,000 out of total $660,354 (19.8%) for: (I) scanning materials to create digital images from text and photographs; (ii) creating digital audio and video clips; and (iii) rekeying selected text portions to make text searchable by word and subject matter.

7. While it has been held that the Library of Congress is not an agency for the purposes of the Administrative Procedure Act, *see Ethnic Employees of Library of Congress v. Boorstin*, 751 F.2d 1405 (D.C.Cir.1985), and the Freedom Of Information Act, *see Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), the Court believes that the procurement decisions made here by the Librarian of Congress are similar to, and thus can reasonably be afforded the same deference as, the procurement decisions of an agency.

which "evidences a significant and deeply ingrained strand of public procurement policy," *S.J. Amoroso Construction Co. v. United States*, 12 F.3d 1072, 1076 (Fed.Cir.1993), is certainly entitled to no less judicial reservation. On the facts of this case, it is clear that the actions of the Librarian of Congress were reasonable and do not approach the level of clear illegality necessary for this court to provide a remedy.

## C. The False Claims Act

■ The government also contends that the plaintiffs-relators have failed to provide it with a disclosure statement sufficiently in accord with the requirements of the FCA. *See* supra, n. 4. While scant authority exists delineating what constitutes a disclosure statement sufficient to survive summary judgment,[8] there is no doubt that it must be more substantive than the notion that "something fishy"[9] is going on. It should, at a minimum, "comprise much of what [the Foundation] will rely upon to support the contentions in the case at bar." *United States ex. rel. Stone v. Rockwell*, 144 F.R.D. 396, 398–400 (D.Colo.1992). It cannot gird itself simply with hearsay from an employee of the purported violator, and then use discovery as a fishing expedition to determine if there was, in fact, a violation.

■ That plaintiffs-relators have very little foundation for the action before the court is evident in a letter from their counsel to the Assistant United States Attorney.[10] The letter discloses that: (I) plaintiffs-relators con-tend that the BAA requires prime contractors to use United States subcontractors; (ii) the SIG project manager admitted to using a subcontractor who hired workers in the Phillippines; (iii) both general contractors agreed to comply with the BAA; (iv) a Library of Congress employee stated that "hundreds of thousands of dollars" of subcontracts were carried out abroad; and (v) the Library of Congress confirmed that some work performed on the American Memory Project was done in the Phillippines and Jamaica. These allegations alone do not indicate that a violation of 31 U.S.C. § 3729 has occurred. While not a prerequisite necessary to satisfy the disclosure requirement, the Court believes more than a mere recitation of facts, available to the government, is required. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).[11]

## D. Sovereign Immunity

Because the Court has determined that neither the Buy American Act nor the Federal False Claims Act was violated, it need not reach the issue of whether the Librarian of Congress is immune under the doctrine of sovereign immunity.

## E. Conclusion

Because there exists no genuine dispute of any material fact, summary judgment is therefore an appropriate resolution to this case. The defendants did not violate the Buy American Act in the procurement procedures

---

8. Neither the Foundation nor the government has cited any authority which speaks to the issue of what comprises a legally sufficient disclosure statement. However, in ruling that disclosure statements are not protected by the attorney-client privilege, courts have reasoned that "the document [is] a recitation of facts and allegations communicated by the plaintiff to the government for the purposes of complying with the statutory conditions precedent to bringing the suit against the defendants." *United States ex rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 682 (S.D.Cal. 1996) (citations omitted).

9. Counsel for plaintiff-relators suggested, in response to an inquiry at the hearing, that the disclosure statement indicated that "something fishy" was going on.

10. Plaintiffs suggest in the letter that the government has already received the disclosure state-ment in the form of the complaint: "Our complaint contains substantially all of the evidence of a violation of the Federal False Claims Act ... However, I will provide you with additional facts." It is clear from the statute, however, that the disclosure should be separate from the complaint. *See* 31 U.S.C. § 3730(b)(2) ("A copy of the complaint *and* written disclosure ... shall be served") (emphasis added). Hence, if this letter is the disclosure statement, it is pre-dated by the institution of the suit, and cannot then serve its own purpose, as stated in *Burroughs*, supra.

11. Even so, the Court would dismiss the FCA claim on the ground that it has determined, as a matter of law, that the Librarian of Congress did not violate the BAA; therefore, no false claim has been made.

used by the Librarian of Congress because the costs of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components. This is true despite the fact that a considerable amount of the work may have been done abroad. Because the BAA was complied with, and because the plaintiffs-relators did not provide the government with an adequate written disclosure statement, the FCA claim must be dismissed. A separate order consistent with this opinion will follow.